## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| YE LI, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Case No. 12-CV-641-TCK-FHM |
| | ) |
| THE UNIVERSITY OF TULSA, a | ) |
| Domestic Not for Profit Corporation; | ) |
| WINONA TANAKA, Individually and as | ) |
| Vice Provost of the University of Tulsa; and | ) |
| RICK ARRINGTON, Individually and as | ) |
| Assistant Dean of the Collins College of | ) |
| Business of the University of Tulsa, | ) |
| | ) |
| Defendants. | ) |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

On December 4, 2012, the Court held a hearing on Plaintiff's Motion for Temporary

Restraining Order, which the Court converted to a motion for preliminary injunction. At the

conclusion of the first day of the proceedings, Plaintiff moved to consolidate the preliminary

injunction hearing with the trial on the merits pursuant to Federal Rule of Civil Procedure 65(a)(2),

which provides that "[b]efore or after beginning a hearing on a motion for preliminary injunction,

the court may advance the trial on the merits and consolidate it with the hearing." Defendants did

not object, and the Court granted the motion. Therefore, these Findings of Fact and Conclusions of

Law are based upon evidence presented at a bench trial held December 4-5, 2012.

## I.     Finding of Fact[1]

1.     The University of Tulsa ("University") is a private university located in Tulsa,

Oklahoma.

---

[1] Any conclusion of law that is more appropriately characterized as a finding of fact is
incorporated herein.

2.      Plaintiff Ye Li ("Plaintiff") was a student in the Collins College of Business ("College") at the University, beginning in the Fall of 2010, until her dismissal on November 21, 2012.

3.      Plaintiff submitted an International Undergraduate Application ("Application") to the University stating that she had taken the Test of English as a Foreign Language ("TOEFL"), obtaining a score of 62.  This score satisfied the University's requirement for proficiency in English.

4.      Along with her Application, Plaintiff also submitted transcripts from her high school education.  During her freshman and sophomore years at Guiyang High School in China, Plaintiff took and passed classes in English.  During her junior year at Henderson County High School in Henderson, Kentucky, Plaintiff took and passed Honors English.  During her senior year at Portland Christian Junior/Senior High School in Portland, Oregon, Plaintiff took and passed classes in Literary Analysis.  Plaintiff graduated from Portland Christian Junior/Senior High School with a 3.071 GPA.

5.      Plaintiff completed an Immigration and Naturalization Service Form I-20 ("Form I-20") certifying her eligibility for a Nonimmigrant Student (F-1) Visa on at least two separate occasions.  Plaintiff verified on her Form I-20 that she had the required English proficiency to attend the University.

A.      College Policy

6.      The College has promulgated a document entitled "Policies and Procedures Relating to Academic Misconduct" ("College Policy").  The College Policy defines academic misconduct as follows:

> Academic misconduct includes any conduct pertaining to academic courses or programs that evidences fraud, deceit, dishonesty, and

> intent to obtain an unfair advantage over other students, or violation of the academic standards and policies of the university.  It includes, but is not limited to, plagiarizing, cheating or otherwise violating the procedures for tests and examinations; turning in counterfeit reports, testing, papers or other work; stealing tests or other academic materials; falsifying academic records or documents . . ., issuing false statements to instructors or academic administrators regarding academic matters; and assisting others in such activities.

(Def.'s Ex. 26.)  It provides that the "College will take appropriate actions to prevent, correct, and discipline conduct that violates this policy."  (*Id.*)

7.  Sections V, VI, and VII of the College Policy govern procedures, sanctions, and appeals related to academic misconduct occurring within the College.  These provisions are set forth in their entirety below:

### V.   PROCEDURES

A.   INITIATING A COMPLAINT.  A complaint may be initiated by an instructor, administrator, staff member, student, or anyone else who has reason to believe that academic misconduct has occurred.

B.   ACTION BY INSTRUCTOR.  An instructor shall investigate and address any complaint of academic misconduct in the instructor's course or program and may recommend further action by the Dean of the College in which the course or program is offered.

1.  A decision by an instructor shall be final and binding when the instructor has notified the student in writing of that decision.

2.  All instructors shall notify the Assistant Dean of the Collins College of Business promptly upon learning about any allegation of academic misconduct.

C.   ACTION BY THE OFFICE OF THE DEAN.  The Dean or the Dean's designee may initiate or pursue any case of academic misconduct in order to enforce academic policies and to maintain the academic integrity of the College and University.

1.  Even when sanctions have been imposed by an instructor for a particular case of academic misconduct, additional sanctions may be applied by a dean in appropriate cases, such as when a student has committed academic misconduct

3

previously or when the academic misconduct is serious enough to warrant additional sanctions.

2.  In cases where a student has been accused of academic misconduct in a course or program offered outside of the student's college of enrollment, action may be initiated and pursued by either or both the office of the dean of the college in which the academic misconduct occurred and the office of the dean of the student's college of enrollment.

3.  A decision by the Dean or the Dean's designee shall be final and binding when the Dean's office has notified the student in writing of that decision.

**VI.   SANCTIONS**

A.   SANCTIONS IMPOSED BY INSTRUCTOR.  An instructor may impose sanctions for academic misconduct that include, but are not limited to, oral and/or written reprimand, counseling, reduced or failing grades for specific assignments or the entire course or program, additional assignments or requirements relating to the course or program, or any combination thereof.

B.   SANCTIONS IMPOSED BY OFFICE OF THE DEAN OR COLLEGE REVIEW BOARD FOR ACADEMIC APPEALS OR ACADEMIC MISCONDUCT (Review Board).  In addition to any sanctions imposed by an instructor, the office of the dean or Review Board may impose sanctions for academic misconduct that include, but are not limited to, oral and/or written reprimand, counseling, reduced or failing grades for a course or program, suspension, probation, dismissal, notations on a student's official records and transcript, revocation of academic honors or degrees, and any other appropriate sanction or combination thereof.

**VII.  APPEALS**

A.   APPEAL TO THE ASSOCIATE DEAN FROM DECISION OF AN INSTRUCTOR

1.  A student who believes that a decision made by an instructor is erroneous may appeal on that ground in writing to the Associate Dean of the College.

2. An appeal to the Associate Dean must be submitted within 7 days after the final decision of an instructor.

3.  A decision by the Associate Dean shall be final and binding when the student is notified in writing of that decision.

4

B.     APPEAL TO THE REVIEW BOARD FROM DECISION OF AN ASSOCIATE DEAN OR OTHER DEAN'S DESIGNEE

1.  A student who believes that the decision made by an Associate Dean or other dean's designee is erroneous may appeal on that ground in writing to the Review Board.

2.  An appeal to the Review Board must be submitted within 7 days after the receiving the final decision from the office of the dean.

3.  The membership and procedures of the Review Board are defined in its charter.

4.  Appeals must be in writing and should include all facts and circumstances that have any bearing on the case, together with all relevant documents, evidence, and names of witnesses.

5.  A student shall have the right to request a hearing before the Review Board.

6.  The Review Board shall have the right to conduct a hearing, to request additional information, and to receive and give such weight to evidence as the Review Board sees fit.

7.  The Board will determine who may speak during an appeal hearing, but in normal circumstances only the student making the appeal, the instructor who filed the allegation, and named witnesses will be asked to address the Review Board.

8.  A student has the right to remain silent, to present personal testimony and evidence, and to have the assistance of a friend, or other advisor of his or her choosing.

9.  A decision of the Review Board shall be final and binding when the Review Board has notified the student in writing of that decision, except as specifically stated below:

a.  If the Review Board recommends suspension, probation, dismissal, revocation of academic honors or degrees, or any combination thereof; such recommendation shall be forwarded to the Dean for final action.

b.  If the Review Board is unable to reach a majority decision, the case will be referred to the College Dean for further review and decision.

C.    FINAL APPEAL TO THE PROVOST
    1.  In the unusual circumstance that the student can make a
    case that the concept of fundamental fairness has been
    violated in the appeal process itself, a final appeal may be
    made to the provost, who may either consider it or decline to
    do so depending on the provost's assessment of the
    circumstances presented.  In all such cases, student appeals
    on academic issues will be final when a decision is rendered
    by the provost.

(*Id.*)

8.    There is no written policy regarding how many academic misconduct violations must

occur prior to dismissal from the College.

**B.    First Incident**

9.    On October 16, 2011, Dr. Jeff Crawford ("Dr. Crawford"), a professor at the

University, notified Plaintiff and another student, Jing Lin ("Lin"), by e-mail that he was concerned

about academic misconduct committed by them in his MIS course, based on striking similarities

between the students' homework assignments.  Specifically, Dr. Crawford notified the students that

the Java computer programming codes that they submitted contained a number of the same

comments, same variable names, and same indentation.  Dr. Crawford gave Plaintiff a zero on the

assignment.

10.    Dr. Crawford informed Rick Arrington ("Dean Arrington"), Assistant Dean of the

College, of the misconduct.  On October 25, 2011, Dean Arrington sent an email to Plaintiff

informing her that she would need to attend a meeting with Dean Arrington and Dr. Crawford to

discuss the academic misconduct issue.  According to Dean Arrington, this grade "could have taken

back if there had not been a finding of misconduct."  (Tr. 82.)

11.     Plaintiff had notice of the misconduct that would be discussed at the October 25, 2011 meeting based on the explanation and allegations in Dr. Crawford's email. Plaintiff's argument that Dr. Crawford's email was somehow insufficient to provide notice is without merit, as the email is broad enough to implicate an allegations against both the student who did the copying and the student who permitted the copying.  (*See* Def.'s Ex. 8 (sent to both students and expressing concern about "copying code from another individual").)

12.     On October 27, 2011, Plaintiff attended a meeting with Dr. Crawford and Dean Arrington.  Plaintiff was given an opportunity to re-read the email and respond to Dr. Crawford's allegations regarding the assignment.  After hearing from both Plaintiff and Dr. Crawford, Dean Arrington determined that Plaintiff had committed academic misconduct in Dr. Crawford's class. Based on this decision, Dean Arrington presented Plaintiff with an Academic Misconduct Acknowledgment form notifying her that she would receive a zero on the homework assignment, admonishing her for academic misconduct, and warning her that future violations could lead to more serious sanctions including dismissal.

13.     In a separate proceeding, Dean Arrington found that Lin also committed academic misconduct, and Lin also received an Academic Misconduct Acknowledgment form.

14.     Plaintiff did not appeal Dean Arrington's decision to give her a zero on the homework assignment to the College Review Board for Academic Appeals or Academic Misconduct ("CRB").

### C.     Second Incident

15.     On September 25, 2012, Dr. Brian Walkup ("Dr. Walkup") reported to Dean Arrington by e-mail that he had observed Plaintiff committing several forms of academic

misconduct during an exam in his finance course.  Specifically, Dr. Walkup reported observing Plaintiff using an unauthorized calculator, sharing the unauthorized calculator with another student, looking at another student's exam, allowing the other student to look at Plaintiff's exam, and finding written notes in Chinese characters on the desk in between Plaintiff and the other student.  Dr. Walkup also reported that, while grading the exam, he noticed that Plaintiff had arrived at the correct answer to a problem even though she had incorrectly set up the problem.  This email was not sent to Plaintiff.

16.     On September 25, 2012, Plaintiff received an email from Dean Arrington's office stating "Hello Ye.  Please come in to see Rick Arrington tomorrow at 11:00am in room 215.  This meeting is NOT optional."  (Pl.'s Ex. 9.)

17.     As a general practice, Dean Arrington does not inform students of the specific allegations against them prior to meeting with them regarding an accusation of academic misconduct.  He testified that "[w]e just provide them a written notice that we need to discuss misconduct, a case of misconduct. And I'll tell you that in the e-mail I don't put all of the details because some students freak out, and I don't accuse them of anything in the e-mail because I don't want them to be so freaked out that they can't talk. I want to hear what they have to say."  (Tr. 86.)

18.     During the exam, Dr. Walkup had verbally warned Plaintiff not to look at the other student's exam and that she would be guilty of academic misconduct if she continued to do so.

19.     Prior to the meeting, Plaintiff did not have specific written notice of the academic misconduct that would be discussed at the September 26, 2012 meeting, although she had been verbally warned about cheating by Dr. Walkup during the exam.

20.     On September 26, 2012, Dean Arrington and Dr. Walkup met with Plaintiff to discuss Dr. Walkup's allegations of academic misconduct.  Plaintiff denied some of the misconduct and admitted to others.  After hearing from both Dr. Walkup and Plaintiff, Dean Arrington decided Plaintiff had committed academic misconduct during the exam.  Dean Arrington presented her with an Academic Misconduct Acknowledgment form, which stated Plaintiff would receive a zero on the exam and admonished her for committing academic misconduct.

21.     This Academic Misconduct Acknowledgment form expressly warned Plaintiff that this was her second case of academic misconduct and that "if there is any other case of misconduct . . .  you will be dismissed from the University of Tulsa."  (Def.'s Ex. 13.)

22.     Plaintiff was not forced to sign the Academic Misconduct Acknowledgment form. No intimidation of Plaintiff occurred during the meeting with Dean Arrington and Dr. Walkup. Neither Dean Arrington or Dr. Walkup engaged in any harassing, intimidating, or otherwise improper behavior toward Plaintiff.

**D.     Third Incident**

23.     On October 2, 2012, Dean Arrington sent Plaintiff an email stating, "Hello, Ye - would you please come to HELM 313, Conference Room at 3:30 on Wednesday [October 3, 2012] to discuss an instance of misconduct in your ACCT 4233 class?"  (Pl.'s Ex. 9.)

24.     On October 3, 2012 at 2:53 pm, just prior to the meeting at 3:30 pm, Dr. Wray Bradley ("Dr. Bradley") sent Dean Arrington an email summarizing allegations of misconduct against Plaintiff – namely, that Plaintiff and five other students had turned in a homework

assignment that included answers that were copied nearly verbatim from an unauthorized answer key.[2]

25.     On October 3, 2012, Dr. Bradley and Dean Arrington met with Plaintiff.  There was no evidence presented at trial regarding what occurred during this meeting.[3]

26.     On October 3, 2012, after concluding that Plaintiff had committed her third instance of academic misconduct, Dean Arrington presented Plaintiff with a letter notifying her that the College had decided to dismiss her from the University, effective October 10, 2012.  Dean Arrington notified Plaintiff of her right to appeal his second and third academic misconduct decisions and/or his decision to dismiss her from the University.  The October 3, 2012 letter contained the dates and times by which Plaintiff had to file these appeals.

### E.     Appeals

27.     On October 3, 2012, Plaintiff sent Dean Arrington an email stating that she wanted to appeal the first and second findings of academic misconduct.

28.     On October 8, 2012, Dean Arrington sent Plaintiff an email stating that the CRB would hear an appeal of the second finding of misconduct.  Plaintiff was not permitted to appeal the first finding of misconduct because such appeal was untimely under the College Policy.  Plaintiff elected not to appeal the third and final finding of misconduct.

---

[2]  Apparently, Dr. Bradley notified Dean Arrington of Plaintiff's alleged misconduct prior to this October 3, 2012 email, since Dean Arrington requested the meeting with Plaintiff on October 2, 2012.

[3]  Defendants' proposed Finding of Fact 28 states that Dean Arrington "gave [Plaintiff] an opportunity to respond to the allegations of misconduct in Dr. Bradley's class."  However, this is not supported by the transcript cite provided.  Such citation is merely Plaintiff's admission that she was found to have committed misconduct in Dr. Bradley's class.  (*See* Tr. 175:1-3.)

29.     On October 9, 2012, the CRB heard Plaintiff's appeal of the second finding of misconduct.  She appeared before the CRB and submitted a written statement for consideration. Plaintiff was not present when Dr. Walkup testified before the CRB.

30.     On October 9, 2012, the CRB unanimously found that Plaintiff committed academic misconduct during Dr. Walkup's exam.

31.     On October 10, 2012, Gale Sullenberger, Dean of the College ("Dean Sullenberger"), notified Plaintiff that her appeal of Dean Arrington's finding of academic misconduct during Dr. Walkup's exam had been denied.

32.     In a separate proceeding, Plaintiff appealed Dean Arrington's decision to dismiss her from the University to the CRB.

33.     On November 2, 2012, the CRB considered Plaintiff's appeal of her dismissal. Plaintiff appeared with two attorneys and made a presentation to the CRB.

34.     The CRB unanimously denied Plaintiff's appeal and recommended that she be dismissed from the University.

35.     On November 5, 2012, Dean Sullenberger accepted the recommendation of the CRB and notified Plaintiff that she was dismissed from the University.

36.     On November 6, 2012, Plaintiff's counsel notified the Provost's Office that Plaintiff intended to appeal the College's decision to dismiss her from the University to the Provost's Office.

37.     On November 12, 2012, Plaintiff submitted her Statement of Appeal to the Provost's Office, requesting that the dismissal decision be vacated.

38.     On November 19, 2012, Plaintiff's attorney presented her appeal and arguments in person to Senior Vice Provost Winona Tanaka ("VP Tanaka").

11

39.     After considering the presentation by Plaintiff's counsel, VP Tanaka concluded that Plaintiff's appeal should be denied and that Plaintiff should be dismissed from the University.  VP Tanaka issued a 15-page Memorandum and Final Decision on November 20, 2012.

40.     VP Tanaka's Memorandum and Final Decision concluded that the College's decision to dismiss Plaintiff was warranted and reasonable, based on academic misconduct committed by Plaintiff on three separate occasions in three different classes, witnessed by three different faculty.

41.     The Memorandum and Final Decision also concluded that the process for dismissing Plaintiff was fundamentally fair and reasonable, and that proper procedures had been followed by faculty and academic administrators at every stage of Plaintiff's case.

42.     The Memorandum and Final Decision found that Plaintiff is proficient in her understanding and use of the English language and that she is capable of reading and understanding the College Policy.

43.     The Memorandum and Final Decision noted that the Provost's Office had investigated Plaintiff's claim of discrimination and unfair treatment, and that the Provost's Office found no evidence of discrimination or unfair treatment.

**F.      Acceptance to Center for English Language**

44.     On November 15, 2012, Plaintiff was accepted to the Center for English Language in Dallas, Texas.  The Center for English Language requested that the University transfer Plaintiff's I-20 student visa record.  However, Plaintiff had requested in person and in writing at the International Student Service's office that her I-20 records not be  transferred.  Plaintiff did not rescind her request that her records not be transferred until during the trial on December 4, 2012.

12

45.     It is the policy of the University to place administrative holds on transcripts while a student is the subject of disciplinary proceedings that will have an immediate impact on entries made in the student's official records and transcript.

46.     On November 16, 2012, Plaintiff filed her Application for Temporary Restraining Order, as well as her Original Complaint asserting claims for breach of contract, retaliation, and intentional infliction of emotional distress.

47.     After the conclusion of the trial, the University received another admission letter from the Center for English Language, and Plaintiff's I-20 was transferred pursuant to Plaintiff's written instruction.[4]

### G.     Emotional Distress

48.     Plaintiff did not suffer severe emotional distress as a result of her dismissal or any events leading thereto.

49.     Plaintiff presented no evidence of discrimination by the University or College against Chinese students.

50.     Prior to her dismissal, Plaintiff did not complain to the International Student's Office about any national origin discrimination she suffered at the University.

### H.     Student Handbook

51.     The University Student Handbook ("Student Handbook") does not apply to academic misconduct cases in the College.  The Student Handbook and procedures outlined therein apply only to non-academic cases initiated by the Dean of Students or her designee.

---

[4] This fact is supported by the affidavit of Pamela Smith, which was attached to Defendants' Motion to Reopen and Supplement the Record ("Motion to Supplement").  The Motion to Supplement is granted, and the affidavit is deemed part of the trial record.

13

52.     All academic misconduct cases in the College are under the purview of the Provost's Division headed by the Provost's Office, not the Dean of Students. The Dean of Students is not part of the Provost's Division, is not a faculty member, and is not an academic administrator.

53.     University policies and accreditation standards require that all academic decisions, including decisions in academic misconduct cases, be made pursuant to policies and procedures adopted and enforced by faculty and academic administrators. At the University, the faculty of each college have promulgated academic misconduct policies that apply to all academic misconduct cases arising in their respective colleges.

54.     The Student Handbook contains at least 14 disclaimers stating that it does not constitute a contract.

55.     VP Tanaka and Dean Arrington are not parties to the College's academic misconduct Policy or the Student Handbook.

## II.     Conclusions of Law[5]

### A.     Count 1 - Breach of Contract

1.     The Court construes Count 1 as alleging a violation of due process protections arising from the university/student relationship, which is a broader claim than violation of any specific terms of the Student Handbook or College Policy. *See Slaughter v. Brigham Young Univ.*, 514 F.2d 622, 626 (10th Cir. 1975) (analyzing claim of wrongful dismissal by private university in terms of due process although the complaint was based on a contract theory). Both parties have provided proposed conclusions of law regarding a student's right to due process, as applied to a private

---

[5] Any finding of fact that is more appropriately characterized as a conclusion of law is incorporated herein.

university's dismissal decision.  Thus, no prejudice will result to Defendants based on the Court's construction of Count 1 in this manner.

2.      "The student-university relationship is unique, and it should not be and cannot be stuffed into one doctrinal category." *Slaughter*, 514 F.2d at 626.  The Tenth Circuit has instructed that "[s]ome elements of the law of contracts are used and should be used in the analysis of the relationship between plaintiff and the University to provide some framework into which to put the problem of expulsion for disciplinary reasons," but that contract law principles should not be rigidly applied.  *See id.* (holding that a district court committed error by adhering to commercial contract principles in analyzing a claim of wrongful dismissal by a university).

3.      Based upon the unique student/university relationship, the Tenth Circuit requires private universities to afford certain due process protections during disciplinary proceedings.  *See id.* at 624-25.  Specifically, the Tenth Circuit has held that a private university must provide notice, thereby making the student "aware of the subject to be considered." *Id.* at 624.  The university must also conduct "an adequate hearing on the charge with a meaningful opportunity given to plaintiff to participate, to present his position, and to hear the witnesses presenting the facts they had knowledge of." *Id.* (declining to draw distinction between public and private universities).  When such protections are followed by school administrators, a court must give deference to any factual findings that are supported by substantial evidence and reverse the dismissal only upon a finding that the decision was arbitrary.  *See id.*  ("The adequacy of the procedure plus the substantial evidence element constitute the basis and the record to test whether the action was arbitrary.").

4.      Based upon this reasoning in *Slaughter*, the Tenth Circuit appears to follow what other courts have referred to as the "fundamental fairness" approach.  Courts following this approach

"have held generally that disciplinary acts by private colleges or universities will be upheld so long as the proceedings have been fundamentally fair and the school has not deviated substantially from the procedures established by the school." *See Boehm v. Univ. of Penn. Sch. of Vet. Med.*, 573 A.2d 575, 579 (Pa. 1990) (citing cases and quoting extensively from *Slaughter*). The Tenth Circuit is not a jurisdiction holding that private universities must only adhere to the "procedural safeguards which the school specifically provides." *See id.* (explaining that some courts do not examine whether a private university's procedures comport with "fundamental fairness" but only whether the procedures outlined are substantially followed by the university).

5.      The Court concludes that Plaintiff was afforded adequate due process and fundamental fairness prior to her dismissal from the University. For two of the three incidents, Plaintiff had actual or constructive notice of the misconduct prior to her meeting with Dean Arrington and the professor. She had actual notice prior to the first meeting based upon Dr. Crawford's email. She had at least some notice prior to the second meeting based upon Dr. Walkup's repeated verbal warnings during the exam.[6] In all three instances, she was informed of the charges against her at the beginning of the meeting, given an opportunity to confront her accuser, and given an opportunity to respond. Contrary to Plaintiff's arguments, the Court does not find that Plaintiff was somehow ambushed during these meetings or that Dean Arrington had his mind made

---

[6] There is no evidence that Plaintiff had any actual or constructive notice of the allegations against her regarding the third instance of misconduct prior to her meeting with Dean Arrington. Dean Arrington's reason for not providing further explanation in his initial email is so that the students will not "freak out." *See supra* Finding of Fact 17. The University, and not this Court, is in the best position to determine how to handle students in these situations. So long as Plaintiff was afforded basic process prior to her ultimate dismissal, the Court will not intervene. In this case, the Court finds that the circumstances as a whole reveal that Plaintiff was afforded a fundamentally fair process prior to her dismissal.

up prior to hearing her version of events.  In all three instances, Dean Arrington simply credited the professor and his documentary evidence over Plaintiff's explanation.  With respect to the second instance of misconduct, Plaintiff admitted to at least some of the allegations.  Therefore, the Court finds that Plaintiff was afforded adequate process prior to all three findings of misconduct by Dean Arrington.

In addition to the above process, Plaintiff was afforded significant appellate process.  Pursuant to the College Policy, Plaintiff filed a timely appeal of the second violation and the dismissal decision.  During these direct appeals, she was represented by counsel and given the opportunity to present oral and written statements, including arguments regarding the validity of each underlying violation.[7]   Finally, she was afforded further process through an appeal to VP Tanaka, who authored a comprehensive opinion setting forth the reasons for dismissal and the fairness and adequacy of the process leading thereto.  Viewing these facts and the entire process afforded to Plaintiff as a whole, the Court finds that Plaintiff had sufficient notice of the reasons for her dismissal and had meaningful opportunities to present evidence and make arguments against her dismissal while represented by counsel.  Any potential due process problems during the initial meetings are lessened in this case, if not cured, by the robust appellate process afforded Plaintiff while she was represented by counsel.

---

[7]  Plaintiff was not present during Dr. Walkup's testimony before the CRB during the appeal of the second violation.  However, Plaintiff heard Dr. Walkup's version of events during the meeting with Dean Arrington and was given a detailed, written statement outlining his allegations.  Therefore, the Court does not find Plaintiff's inability to cross-examine Dr. Walkup during the CRB hearing to render the overall process fundamentally unfair or non-compliant with *Slaughter*.

6.      The Court also concludes that the dismissal decision was supported by substantial evidence and was not arbitrary or capricious.  Each professor expressed his opinion that a violation had occurred and supported such opinion with documentary evidence.  Plaintiff argues that the first finding of academic misconduct, and appellate affirmation thereof, is unsupported by substantial evidence because Lin allegedly confessed to committing plagiarism without Plaintiff's knowledge. This argument is unavailing.  First, there are disputed facts in the record regarding which student actually did the copying – namely, Lin's email confession, (*see* Pl.'s Ex. 18), and Dr. Crawford's recollection that Plaintiff (the student who dropped the course) was the student who copied Lin's work, (*see* Def.'s Ex. 7).  Second, academic misconduct includes both committing plagiarism and permitting plagiarism, and there was also sufficient evidence supporting a finding that, if Plaintiff did not do the copying, she knowingly permitted the copying.  This Court will not make credibility determinations or re-weigh evidence, and the Court concludes that Dean Arrington, the CRB, and VP Tanaka's findings regarding the first instance of misconduct were not arbitrary or capricious.

Plaintiff also argues that the decision was arbitrary because the College does not have a written policy specifying that the third instance of academic misconduct will result in dismissal. This argument is unpersuasive.  A university legitimately may desire flexibility in the sanction to be given, depending on the nature of the violation or violations in question, and the Court finds no procedural infirmity based on the lack of a written policy specifying when dismissal will occur.  In this case, Dean Arrington warned Plaintiff that one more violation would result in dismissal and then followed through with that warning.  There was nothing "arbitrary" about Dean Arrington's decision to dismiss Plaintiff upon the third violation.

7.      Considering the process as a whole, Defendants complied with the concept of "fundamental fairness" in dismissing Plaintiff for academic misconduct and did not breach any obligations flowing to Plaintiff by virtue of the university/student relationship.

8.      The Court also concludes that Plaintiff was afforded all process set forth in Sections V-VII of the College Policy. Section V of the College Policy permits a complaint to be initiated by a professor *or* the dean's office. It does not require written notice of the charges against the student prior to either the dean or the professor's final decision, although it states that a professor's decision becomes final and appealable when issued in writing to the student. In the three instances before the Court, no professor issued a final written decision to Plaintiff. Instead, each professor informed Dean Arrington of the misconduct and allowed him to initiate the complaint against Plaintiff. Thus, Dean Arrington issued the first written decisions to Plaintiff regarding the misconduct by issuing the Academic Misconduct Acknowledgment forms. In other words, Dean Arrington conducted the initial "trials," and he was not an appeal from a professor's final decision. This process is in compliance with the College Policy, although there are other processes that could have been employed – namely, a final written decision by professors that were then appealed to Dean Arrington.[8]

9.      The Student Handbook does not form any part of the contractual relationship between Plaintiff and the University. The Student Handbook contains at least 14 statements that expressly

---

[8]      While the process employed is in compliance with the College Policy, the process resulted in Plaintiff entering Dean Arrington's office on two occasions without written notice of the violations against her. *See supra* n. 6. In this case, considering the process as a whole prior to dismissal, Plaintiff was not deprived of notice or fundamental fairness. However, this notice problem would be solved if professors conducted an investigation, issued a written decision to the student, and then informed the student of the right to appeal to Dean Arrington or if Dean Arrington provided notice of the allegations prior to meeting with the student.

disclaim any intent that the Student Handbook form the basis of any contract between the University and student. *See Doe v. Okla. City Univ.*, 406 Fed. Appx. 248, 252 (10th Cir. 2010) (affirming conclusion of district court that private law school's student handbook did not create a contract because it "plainly stated that it did not form a contract between the students and the university"). Further, assuming the Student Handbook did somehow create contractual obligations, the provisions of the Student Handbook relied upon by Plaintiff, which require five days notice prior to any hearing, applies to non-academic cases brought by the Dean of Students or her designee and does not apply to cases of academic misconduct in the College.

10.     Even if the Student Handbook did somehow create a contract between the University and Plaintiff, VP Tanaka and Dean Arrington may not be held liable for its breach because they are not individual parties to the Student Handbook. *Roach v. Univ. of Utah*, 968 F. Supp. 1446, 1455 n.4 (D. Utah 1997) (dismissing individual defendants because, if and to the extent a student handbook created a contract, it was only between the student and the university).

**B.      Count II - Retaliation**

11.     Plaintiff did not present any conclusions of law regarding this claim, and it has been abandoned.

12.     Assuming the claim was not abandoned, the University did not withhold Plaintiff's I-20 records and did not prevent her from transferring to another educational institution in retaliation for complaints Plaintiff made about discriminatory treatment by Chinese students. Rather, the University withheld Plaintiff's I-20 records based upon Plaintiff's written instruction.

### C.       Count III - Intentional Infliction of Emotional Distress

13.       To state a claim for intentional infliction of emotional distress, a plaintiff must allege that (1) the defendant acted intentionally or recklessly; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's conduct caused the plaintiff emotional distress; and (4) the resulting emotional distress was severe. *Schovanec v. Archdiocese of Okla.*, 188 P.3d 158, 175 (Okla. 2008) (citations omitted).

14.       Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community. *Breeden v. League Servc. Corp.*, 575 P.2d 1374, 1376 (Okla. 1978) (citing Restatement (Second) of Torts, § 46).  A court must make an initial determination that the defendant's conduct "may be reasonably regarded as sufficiently extreme and outrageous to meet the Restatement § 46 standards." *Trentadue v. United States*, 397 F.3d 840, 856 n.7 (10th Cir. 2005) (applying Oklahoma law).  The court must also make a threshold determination that any distress suffered by the plaintiff is severe. *Id.*

15.       No Defendants engaged in any conduct that could be deemed so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community.  Plaintiff was dismissed based upon three instances of academic misconduct and was not the target of any discriminatory, harsh, or unfair treatment during this process. *See generally Mason v. State ex rel. Bd. of Regents of the Univ. of Okla.*, 23 P.3d 964 (Okla. Civ. App. 2000) (finding that university's decision to deny application for readmission following expulsion falls far short of the level of outrageous conduct necessary to support this cause of action).

16.     Plaintiff's trial testimony failed to demonstrate that she suffered any severe emotional distress as a result of Defendants' conduct.

**D.      Request for Injunctive Relief**

17.     Plaintiff's request to be readmitted to the University is moot, as Plaintiff's counsel stated on the record that Plaintiff was no longer seeking this type of injunctive relief.

18.     Any other injunctive relief requested by Plaintiff, such as removing the "dismissal" notation from her transcript, is denied because Plaintiff has failed to succeed on the merits of any of her claims.

**III.   Conclusion**

Plaintiff's Motion for Preliminary Injunction (Doc. 3) is DENIED.  Defendant's Motion to Reopen (Doc. 30) is GRANTED.  Plaintiff has failed to prove any of her claims, and Defendants are entitled to judgment in their favor.  These Findings of Fact and Conclusions of Law conclude the litigation.

**SO ORDERED** this 29th day of January, 2013.


**TERENCE KERN**
**United States District Judge**

22